346 So.2d 875 (1977)
H. Lanier RICHEY
v.
VENTURE OIL & GAS CORPORATION (H & W Oil & Gas Company, Inc.).
No. 8511.
Court of Appeal of Louisiana, Fourth Circuit.
May 17, 1977.
*876 Gordon, Arata, McCollam & Watters, Blake G. Arata, Andrew L. Gates, III, New Orleans, for plaintiff-appellee.
Monroe & Lemann, Richmond M. Eustis, New Orleans, for intervenor-appellant, H & W Oil & Gas Co., Inc.
Before SAMUEL, GULOTTA and BOUTALL, JJ.
GULOTTA, Judge.
We are confronted with a question involving ranking of privileges.
The relevant facts are as follows. Venture Oil & Gas Corporation executed a promissory note dated September 10, 1974, in the principal sum of $300,000.00 payable to The Merchants National Bank of Mobile for a loan in that sum made by the bank to Venture. The note was secured by the pledge of a $1,000,000.00 collateral mortgage note and collateral mortgage dated August 29, 1974. The property mortgaged was a State oil lease in Plaquemines Parish where oil drilling had been in operation.
On January 26, 1976, the bank transferred, sold and assigned to plaintiff the hand *877 note of September 10, 1974, secured by the August 29, 1974 collateral note and mortgage. Both notes were negotiated "without recourse" by the bank to plaintiff.
As holder and owner of the September 10 promissory note, plaintiff, after default in payment, filed this suit for sale of the mortgaged oil lease under executory process and sought payment of its claim for $290,272.90 (the outstanding balance due on the note) plus stipulated interest, attorney's fees and costs. H & W Oil & Gas Company, Inc., owner of a $125,000.00 note executed by Venture and secured by a mortgage and vendor's lien on the aforementioned oil lease, seeks through intervention in this suit to have its mortgage and vendor's lien prime plaintiff's collateral mortgage.
Intervenor's mortgage and vendor's lien were acquired in connection with a credit sale of the State lease from H & W Oil to Venture dated September 11, 1974, for the sum of $300,000.00 under terms of $175,000.00 cash and the balance secured by the vendor's lien and mortgage in the sum of $125,000.00. This act of sale contained the following subordination clause:
"Notwithstanding anything herein to the contrary the mortgage and vendor's lien granted herein to vendor is subordinate and second to that certain collateral mortgage executed by Venture Oil & Gas Corporation securing a $1,000,000.00 collateral mortgage note dated August 29, 1974, which said mortgage is recorded in M.O.B. 77, Folio 856, of the records of Plaquemines Parish, Louisiana. Purchaser warrants to vendor that said collateral mortgage note is pledged to The Merchants National Bank of Mobile to secure sums not exceeding $300,000.00. Purchaser warrants that it will not pledge said note to secure any additional borrowings during the existence of the mortgage granted herein."
Based on this recitation, the trial judge concluded that plaintiff's collateral mortgage is superior to intervenor's mortgage and vendor's lien. Intervenor appeals. We affirm.
We reject intervenor's contention (based on LSA-C.C. art. 3165 which sets forth in pertinent part, "The creditor cannot, in case of failure of payment, dispose of the pledge . . ..") that Venture's original creditor, Merchants Bank, had no right to transfer to plaintiff the pledged collateral mortgage note and, therefore, plaintiff is an unsecured creditor. We have no quarrel with the rule that ordinarily a pledgee cannot sell or transfer the pledged property absent an express agreement.[1] However, in the instant case, the hand note in the principal sum of $300,000.00 secured by the pledge of the collateral note and mortgage has been sold and assigned by the bank to plaintiff. We know of no authority and have been cited none which prohibits such a sale.
In Odom v. Cherokee Homes, Inc., 165 So.2d 855 (La.App. 4th Cir. 1964), writ refused, 246 La. 868, 167 So.2d 677 (1964), cited by intervenor, four collateral mortgage notes issued by Cherokee Homes, Inc. (the debtor) to Morgan (the first creditor) *878 were transferred for value to Odom (the second creditor). No assignment or transfer of Cherokee's primary indebtedness (the hand note, if one existed) was made to Odom. Following the transfer of the collateral mortgage notes, Cherokee issued a hand note to Odom secured by the collateral notes and mortgages. The court held that without the transfer by Morgan of evidence of the primary indebtedness (the hand note, if one existed), he, Morgan, had no right to transfer the pledged mortgage notes. The court stated at page 864:
"* * * Morgan did not own the collateral mortgage notes and stock, he held them in pledge as security for the corporation's indebtedness to him. * * * Obviously Morgan could not sell something he did not own. There was no transfer to Odom of the primary debt owed by the corporation to Morgan, and a sale of collateral divorced from the debt it is pledged to secure would amount to a conversion."
The court further concluded that the transaction was a payment of Cherokee's indebtedness to Morgan; and that pledge of the collateral mortgage notes in connection with the subsequent hand note given to Odom constituted a reissuance of the notes. According to the court, under the circumstances, Odom's collateral mortgage, for ranking purposes, dated from the time of reissuance and not from the time of the original pledge of the collateral notes to Morgan.
The facts in the instant case, however, are distinguishable from those in Odom. Unlike Odom, in our case the $300,000.00 hand note, secured by the collateral mortgage and note, was transferred by the original creditor to Richey, the subsequent creditor. In our case, both the hand note and collateral mortgage note were endorsed "without recourse" from Merchants Bank and assigned to plaintiff. The Odom court pointed out that no transfer of the primary debt (the hand note, if one existed) was made to the subsequent creditor. Though not stated in the Odom opinion, a reasonable inference is created (albeit dicta) that were the hand note transferred along with the collateral note and mortgage (as in our case), a different result would follow. See Nathan and Marshall, "The Collateral Mortgage", 33 La.L.R. 497, 512-513 (1973) for a discussion of the Odom case.
We might point out further that the collateral mortgage executed by Venture provides in pertinent part as follows:
"Mortgagee may transfer, negotiate, pledge or otherwise dispose of the aforesaid promissory note, and should any person pay said note and be subrogated to the rights and claims of the Mortgagee, then in either of said events, the Mortgagee shall have the right to transfer or pledge to transferee, pledgee or subrogee of said note, as the case may be, as security for the payment of said note, all the rights herein mortgaged, pledged, or assigned to the Mortgagee, but no such transfer or pledge shall have the effect of enlarging the obligations or prejudicing any of the rights of Mortgagor under this act or said note."
We interpret this provision to mean that the right is conferred upon Merchants Bank to transfer the collateral mortgage note in connection with a transfer of the hand note. The above provision and the Odom decision considered, we conclude Merchants Bank had the right to dispose of the hand note and the pledged property securing the note and that plaintiff's lien is effective from the date of existence of the original debt (September 10, 1974) from Venture to Merchants Bank.
We further reject intervenor's contention that the consent granted in the collateral mortgage to transfer the pledged property is vitiated because only one of the three persons who signed the collateral mortgage note signed the collateral mortgage. It is true that the collateral mortgage note was signed by Venture and two other parties, and the collateral mortgage was signed only by Venture through its president. Nevertheless, Venture alone was the owner of the mortgaged property.
*879 Under the circumstances, no necessity existed for the remaining two parties to sign the collateral mortgage.
In the subordination clause of the credit sale dated September 11, 1974, Venture warranted to intervenor that the collateral mortgage note is pledged to Merchants Bank to secure sums not exceeding $300,000.00. Venture further warranted in the subordination agreement that it would not pledge the note to secure any additional "borrowings" during the existence of the collateral mortgage. Intervenor claims that a subsequent loan was made by Venture from Merchants Bank in the sum of $75,000.00, evidenced by a note from Venture in favor of the bank, dated June 5, 1975. This subsequent loan, intervenor contends, is in contravention of the subordination clause and either: 1) nullifies the credit sale from intervenor to Venture, thereby returning intervenor to its former position of owner of the property; or, alternatively, 2) nullifies the subordination clause, thereby affording intervenor priority to the extent of its mortgage and vendor's lien; or, alternatively, 3) entitles intervenor to preference to the extent of the additional borrowing, i. e., $75,000.00 plus interest. We do not agree.
In his deposition, Peter C. Petroutson, vice president of the bank, stated that the subsequent $75,000.00 loan was an unsecured loan. Further, a ledger sheet of Venture's negotiations with the bank, introduced into evidence in connection with the deposition, indicates that on March 7, 1975, a $75,000.00 loan was made for which a 90-day demand note was given to the bank. No indication exists that this loan is secured by the collateral note and mortgage or that this loan has any connecton with the collateral mortgage transaction. The 90-day demand note was renewed on June 6, 1975, and apparently was paid on December 18, 1975. Under the circumstances, we conclude that Venture did "not pledge" the note "to secure any additional borrowings".
We find no merit further to intervenor's contentions that the subordination agreement covered only advances made prior to the effective date of intervenor's mortgage and vendor's lien (which intervenor claims is September 1, 1974)[2] and, because the $300,000.00 loan was made subsequent to September 1, 1974 (on September 10, 1974), that intervenor's mortgage and vendor's lien prime plaintiff's mortgage. Clearly, the subordination clause recognizes the existence of a loan not in excess of $300,000.00 in favor of Merchants Bank and subordinates intervenor's mortgage and vendor's lien to the collateral mortgage in favor of the bank irrespective of when the loan is made, i. e., before or after September 1, 1974. A different interpretation would have the effect of reading out of the credit sale the subordination clause. This clearly was not the intent of the parties. The subordination clause in itself is adequate answer to this contention. The clause, in pertinent part, reads as follows:
"Notwithstanding anything herein to the contrary the mortgage and vendor's lien granted herein to vendor is subordinate and second to that certain collateral mortgage executed by Venture Oil & Gas Corporation securing a $1,000,000.00 collateral mortgage note dated August 29, 1974. . .."
We reject also intervenor's claim that the collateral mortgage is not valid as an authentic act because of the failure of Merchants Bank to appear and sign the mortgage although the mortgage specifies that the bank is one of the "appearers". According to intervenor, the collateral mortgage is not in compliance with LSA-C.C. art. 3305.[3] We find no failure of compliance of the collateral mortgage with LSA-C.C. art. 3305. Examination of the document indicates that it was executed *880 before a notary public[4] and two witnesses.[5] It is true that the collateral mortgage has not been signed by a representative of the bank, however, we know of no authority, nor have we been cited any, which states that failure by the mortgagee to sign the mortgage vitiates the document.[6]
Finally, we find no merit to intervenor's contention that the bank's failure to accept the collateral mortgage until December 15, 1975, subordinates the collateral mortgage to intervenor's mortgage and vendor's lien. Intervenor points out that since no acceptance was made of the collateral mortgage by the bank (until December 15, 1975), the effectiveness of the mortgage was suspended or dormant until the bank acted upon the mortgage by making the $300,000.00 loan on September 10, 1974, subsequent to the effective date of the vendor's lien and mortgage, which intervenor contends is September 1, 1974. Because the collateral mortgage was not accepted until December 15, 1975, intervenor argues, his mortgage and vendor's lien cannot be subordinated to it. We do not agree. In the time-honored case of Roberts v. Bauer, 35 La.Ann. 453, 455-461 (La.1883), cited by plaintiff, the court stated:
"It was long since decided by this Court, that:
`The formal written acceptance of the mortgagee was not necessary. The acceptance of the note by the payee was an acceptance of the mortgage which it stipulated, and by the delivery of the note the entire contract became complete between the debtor and the creditor.' * * *"
Applying the Bauer case to the matter before us, we conclude that the making of the $300,000.00 loan constitutes acceptance of the collateral mortgage and note. In view of our previous conclusion that the recitation in the collateral mortgage subordinates intervenor's mortgage and vendor's lien to the collateral mortgage irrespective of when the actual loan was made, i. e., before or after September 1, 1974, we consider the lack of acceptance of the collateral mortgage on that date to be without significance insofar as ranking of privilege is concerned.
For the foregoing reasons, we conclude the trial judge properly gave effect to the subordination provision contained in the act of sale and properly ranked the collateral mortgage superior to the intervenor's mortgage and vendor's lien. The judgment is affirmed.
AFFIRMED.
NOTES
[1] LSA-C.C. art. 3165 reads as follows:

Art. 3165. Rights of pledgee on default of debtor; procedure
"Art. 3165. The creditor cannot, in case of failure of payment, dispose of the pledge; but when there have been pledges of stock, bonds or other property, for the payment of any debt or obligation, it shall be necessary before such stocks, bonds or other property so pledged shall be sold for the payment of the debt, for which such pledge was made, that the holder of such pledge be compelled to obtain a judgment in the ordinary course of law, and the same formalities in all respects shall be observed in the sale of property so pledged as in ordinary cases; but in all pledges of movable property, or rights, or credits, stocks, bonds or other movable property, it shall be lawful for the pledger to authorize the sale or other disposition of the property pledged, in such manner as may be agreed upon by the parties without the intervention of courts of justice; provided, that all existing pledges shall remain in force and be subject to the provisions of this act."
See also LSA-C.C. art. 2452; D'Amico v. Canizaro, 256 La. 801, 239 So.2d 339 (1970); Steiner v. Zammit, 279 So.2d 728 (La.App. 1st Cir. 1973).
[2] The credit sale dated September 11 contained the following recitation: "This sale is effective 7:00 a. m., September 1, 1974."
[3] LSA-C.C. art. 3305 reads as follows:

Art. 3305. Written form of conventional mortgage; mortgage of ships and other vessels
"Art. 3305. A conventional mortgage can only be contracted by act passed in presence of a Notary and two witnesses, or by act under private signature. * * *"
[4] Robert J. Moffatt.
[5] H. N. Kinney Brookings and Paul R. Waddle, witnesses.
[6] Indeed, the mortgagee's failure to sign the act does not nullify the mortgage. Richardson v. McDonald, 139 La. 651, 71 So. 934 (1916).