BARRY, Judge.
T. D. Bickham Corp. purchased the Elk Place Medical Plaza in New Orleans at a judicial sale. Dr. Ronald Hebert, d/b/a Elk Place Dental Center occupied two suites in the Plaza pursuant to separate leases with initial ten year terms and two five year options. Bickham sued to evict Dr. Hebert contending the leases were subordinate to the mortgage on Plaza and the judicial sale canceled both leases. Bickham also sued Alpha Partnership alleging Dr. Hebert assigned both leases to Alpha contrary to a lease provision. The Trial Judge dismissed plaintiff’s eviction rule and the following issues are on appeal:
1) Is an unrecorded lease dissolved because of a judicial sale?
2)' Was the lease voided because of its alleged transfer?
3) Does the subordination clause rank the recorded lease inferior to a subsequent mortgage?
On October 2, 1975 Dr. Hebert signed a lease with Plaza for suite 1700 and on September 1, 1976 Dr. Hebert, d/b/a Elk Place Dental Center, executed a lease on suite 1717. The second lease was recorded on December 2, 1976. On December 22, 1977 the owner of Plaza placed a mortgage on the property in favor of Mutual Life Insurance Company of New York which later foreclosed and Bickham purchased the Plaza at the judicial sale on October 27, 1980. Bickham then notified Dr. Hebert the two leases were canceled but occupancy could continue pending renegotiation of the leases. The parties could not agree on new terms and on February 18, 1981 Bickham gave ten days notice to vacate after which this eviction rule was filed.
The lower court dismissed Bickham’s lawsuit and in brief oral reasons stated: “And all parties were aware of the amounts of the improvements that were made by some of the tenants and the considerations that were given to those tenants in order that these improvements would be made.” The court then said both leases were properly recorded.
We find no proof that the lease for suite 1700 was recorded and defendants’ answer to the eviction rule admitted the lease was never recorded. Any contract affecting immovable property is without effect as to third parties until filed for registry in the public records. LSA-C.C. Art. 2266; LSA-R.S. 9:2721. The unrecorded lease was dissolved by the judicial sale. Flower v. Pearce, 45 La.Ann. 853,13 So. 150 (1893). The lower court finding to the contrary was clearly wrong and is reversed.
Whether or not Dr. Hebert subleased suite 1717 is a question of fact. The lease provides:
“Lessee shall neither make a sublease nor any transfer of this lease, in whole or in part, nor give nor grant to anyone the use, possession or occupancy of any portion of the leased premises for desk room or other purposes ...”
Bickham maintains the Alpha articles of partnership mention suite 1717 as its address and the lease was Dr. Hebert’s contribution to its capital. Also, the dentists agreed to indemnify each other for any liability in excess of their pro-rata shares. Bickham cites LSA-C.C. Art. 2725[1] which provides that a sublease prohibition clause is to be strictly construed and LSA-C.C. Art. 2729 [2] entitles either party to a cancel *191 lation. In Illinois Central Gulf Railroad Co., v. International Harvester Co., 368 So.2d 1009 (La.1979) the Supreme Court held the strict construction required by art. 2725 applied against the lessee. Bickham urges Dr. Hebert’s actions amounted to a sublease violation which dissolved the lease.
Dr. Hebert testified he was a self-employed orthodontist and wasn’t employed by, nor received a salary from, the Alpha Partnership. He was the sole owner of Elk Place Dental Center when he signed the 1717 lease. He stated the clinic was originally organized for some dentists to be employees and others to participate in its ownership. After two years his dental associates decided to buy into the clinic and that was accomplished by forming Alpha. Each contributed capital and the partners assumed the rental for suite 1717. Dr. Hebert said Alpha had no bank account and Elk Place Dental Center made all lease payments.
These facts indicate Alpha Partnership was only a vehicle for business purposes. The lease was always in Dr. Hebert’s name, d/b/a Elk Place Dental Center. The same parties used the suite before and after Alpha was formed and the premises were never used for anything other than dental offices. Further, we note Dr. Hebert’s personal liability for the lease didn’t change. Defendants’ possession of 1717 remained constant from inception of the lease and Bickham’s status as lessor was never in jeopardy. Our courts have been reluctant to dissolve a lease, and then only when the lessor is clearly entitled it. Atkinson v. Richeson, 393 So.2d 801 (La.App. 2d Cir. 1981). Based on this record we conclude Dr. Hebert’s actions did not constitute a sublease in contravention of the lease.
The last issue is res nova and involves a question of law, i.e., the interpretation of the following subordination provision:
“This lease shall at all times be subject and subordinate to the lien of any mortgage or mortgages now or hereafter placed upon said “EPMP” (Plaza), and to all advances made or hereafter to be made upon the security thereof. Lessee agrees to execute and deliver such further instrument or instruments, subordinating this lease to the lien of any such mortgage or mortgages, at any time same may or shall be desired by any mortgage or proposed mortgage of any Lessor.”
There was testimony from a former employee of the Plaza who negotiated the leases with Dr. Hebert. Over Bickham’s objections, he testified about discussing the subordination clause with Dr. Hebert and advised him of its meaning, after which Dr. Hebert borrowed money for improvements to the suites. However, this testimony is immaterial because leasehold improvements aren’t germane to our determination of the subordination clause’s validity.
The 1717 lease was recorded December 2, 1976 and the former owner’s mortgage executed on December 22, 1977. Bickham argues the mortgage rendered the lease inferior as a matter of law and the judicial sale dissolved the lease as if it had been recorded subsequent to the mortgage. Bickham cites Richey v. Venture Oil & Gas Corp., 346 So.2d 875 (La.App. 4th Cir.) writ ref., 350 So.2d 891 (La.1977), wherein the court approved a similar contractual provision modifying rights established by law. Bickham asserts the language of the subordination clause is clear and unambigious and means the lease would be inferior to any mortgage and it is entitled to rely on the recorded lease indicating the Plaza was purchased free and clear of the leases. Bickham argues the rationale of this clause is the negative economic effect of a long term lease which impairs the value of a building. Also, the clause protects the lender in the event of a foreclosure.
Defendants respond that the subordination clause is general and indefinite, whereas the clause in Richey, supra, was specific in subordinating land to a specific mortgage. Defendants assert a strict reading of the clause clearly shows an intention to reserve to the lessor the right to enter into a future mortgage, but subordination would take place only after a mortgage and upon execution of a specific contract with the lessee which never happened.
*192 We feel the subordination clause is clearly ambiguous and therefore should be interpreted in favor of the lessee. Wilson v. Cost + Plus of Vivian, Inc., 375 So.2d 683 (La.App. 2nd Cir. 1979). It provides lease subordination” ... to the lien of any mortgage or mortgages now or hereafter placed ...” (emphasis added). This would allow a lessor to subordinate a lease at any time merely by borrowing any amount of money and the lessor’s good faith is immaterial. If the lessor isn’t satisfied with the current lease, or higher rents are desired, then a fresh mortgage and subsequent foreclosure cleans the slate and the lessee is at the mercy of the lessor to either sign a new lease or be evicted. This type of general open-end provision is vague, indefinite and repugnant to the bilateral nature of a contract, and in our opinion is contra bonos mores. “Every condition of a thing impossible, or contra bonos mores (repugnant to moral conduct) or prohibited by law, is null, and renders void the agreement which depends on it.” LSA-C.C. Art. 2031.
We note the very broad and indefinite qualifying provision of the subordination clause:
“Lessee agrees to execute and deliver such further instrument or instruments, subordinating this lease to the lien of any such mortgage or mortgages, at any time same may or shall be desired by any mortgage or proposed mortgage of any Lessor.”
Bickham does not assert, nor is there proof, that defendants were ever requested to execute a subordination instrument after the mortgage on December 22, 1977.
We therefore sever from the suite 1717 lease the entire provision relating to subordination as quoted hereinabove. Morse v. J. Ray McDermott & Co., Inc., 344 So.2d 1353 (La.1976). The lower court judgment is reversed so that plaintiff/appellant is awarded possession of suite 1700 of the Plaza; in all other respects the judgment of the District Court is affirmed with appellant to pay all costs of appeal.
REVERSED IN PART; AFFIRMED IN PART.

. LSA-C.C. Art. 2725. LESSEE’S RIGHT TO SUBLEASE. The lessee has the right to under-lease, or even to cede his lease to another person, unless this power has been expressly interdicted.
The interdiction may be for the whole, or for a part; and this clause is always construed strictly.

. LSA-C.C. Art. 2729. FAILURE OF PARTIES TO FULFILL OBLIGATIONS. The neglect of the lessor or lessee to fulfill his engagements, may also give cause for a dissolution of the lease, in the manner expressed concerning contracts in general, except that the judge can not order any delay of the dissolution.